**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES DENNIS, M.D., | : |
| Plaintiff, | :     Civ. Action No. |
| v. | : |
| DEBORAH HEART AND LUNG CENTER and DEBORAH HEART AND LUNG CENTER PROFESSIONAL STAFF ACCUMULATION PLAN, | :     **COMPLAINT** |
| Defendants | : |

Plaintiff Charles Dennis, M.D. ("Dr. Dennis"), by and through his counsel, Pashman Stein Walder Hayden, P.C., by way of complaint against Defendants Deborah Heart and Lung Center and Deborah Heart and Lung Center Professional Staff Accumulation Plan avers as follows:

## NATURE OF THE ACTION

1.     This is an action seeking benefits and other forms of relief under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.     Defendant Deborah Heart and Lung Center ("DHLC"), acting as plan administrator, wrongfully denied Dr. Dennis's claim for benefits under Defendant Deborah Heart and Lung Center Professional Staff Accumulation Plan (the "Plan") and breached its fiduciary duty to act solely in the interest of participants and beneficiaries of the Plan.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over Plaintiff's claims under ERISA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

1

4.      Venue is proper in this judicial district pursuant to 29 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## THE PARTIES

5.      Plaintiff Charles Dennis, M.D., is an individual and a resident of Moorestown, New Jersey.

6.      Defendant Deborah Heart & Lung Center ("DHLC") is a New Jersey hospital located at 200 Trenton Road, Browns Mills, New Jersey 08015.

7.      Defendant Deborah Heart and Lung Center Professional Staff Accumulation Plan is an ERISA plan. (A copy of the written plan instrument (hereinafter, the "Plan Document") is attached as Exhibit A).

8.      The Plan Document states that it is an "exempt welfare plan under regulations promulgated under Title I of [ERISA]."  (Exhibit A, ¶ 10a).

9.      The Plan Document states that DHLC is the "named fiduciary" and "plan administrator" of the Plan for the purposes of ERISA.  (*Id*. at ¶ 10b).

## FACTUAL BACKGROUND

10.      Dr. Dennis is a former employee of DHLC.

11.      In 1993, DHLC invited certain employees, including Dr. Dennis, to participate in the Plan.

12.      DHLC and one of its vendors, Morrill, Koslow & Associates ("MKA"), presented the terms of the Plan to Dr. Dennis.

13.      Dr. Dennis elected to participate in the Plan and began to defer a portion of his compensation from DHLC beginning in February 1994.

14.      Dr. Dennis is a participant in the Plan as that term is defined by ERISA.

2

15.     A portion of Dr. Dennis's contributions were used to pay the premiums on a variable life insurance policy with Nationwide Life Insurance Company (the "Nationwide Policy").

16.     The remaining portion of Dr. Dennis's contributions were used to fund investments associated with the Nationwide Policy.

17.     When Dr. Dennis elected to participate in the Plan, he was required to sign two documents purporting to assign certain rights under the Nationwide Policy to DHLC (the "Assignments").

18.     The Assignments, one dated March 11, 1994 and the other dated July 21, 1994, both state that "[f]or value received," Dr. Dennis transferred to DHLC the Nationwide Policy, including certain enumerated rights.

19.     The Assignments further state that Dr. Dennis incurred certain liabilities to DHLC and/or owed certain obligations to DHLC, and that the Assignments were "collateral security" for those liabilities or obligations.

20.     Specifically, the Assignment dated March 11, 1994 states that the "assignment is made, and the Policy is to be held as collateral security, for the liabilities (the "Liabilities") of the undersigned to the Assignee in connection with premium contributions made by the Assignee pursuant to a Split Dollar Agreement between the undersigned and the Assignee."

21.     The Assignment dated July 21, 1994 states that the "assignment is made as collateral security for an obligation owed to assignee, which includes any amounts hereafter advanced by the assignee, plus interest, for the purpose of paying premiums on the policy."

22.     Despite those representations, Dr. Dennis has never owed any obligations to DHLC nor has he incurred any liabilities to DHLC as a result of the Plan.

23.     Under the Plan, Dr. Dennis had sole discretion to determine how much deferred compensation to contribute to the Plan.

24.     Dr. Dennis initially contributed approximately $52,000 per year to the Plan.

25.     Dr. Dennis later increased his annual contributions to the Plan to $75,000.

26.     Dr. Dennis fully funded all of the contributions to the Plan from the compensation he received from DHLC.

27.     DHLC did not provide any employer-funded contributions to the Plan or to the Nationwide Policy.

28.     DHLC did not make any loans or advances to Dr. Dennis to enable him to pay the premiums for the Nationwide Policy.

29.     Dr. Dennis continued to make contributions to the Plan until 2006, when he resigned from DHLC.

30.     In connection with his resignation, Dr. Dennis and DHLC entered into a Separation Agreement and General Release (the "Separation Agreement").

31.     In the Separation Agreement, Dr. Dennis expressly reserved his right to file claims under ERISA relating to vested benefits.

32.     Between 2006 and the current date, Dr. Dennis has paid all of the premiums associated with the Nationwide Policy by liquidating investments associated with the policy.

33.     Under the Plan, Dr. Dennis has the right "to borrow policy values . . . in excess of the collaterally assigned interest of the Employer . . ." (Exhibit A, ¶ 4b).

34.     In February 2018, Dr. Dennis sought to borrow policy values as expressly permitted under the Plan.

35.     On February 9, 2018, Dr. Dennis asked his financial advisor Daniel Roccato to arrange for a loan from the Nationwide Policy.

36.     On February 14, 2018, Nationwide Life Insurance Company advised Mr. Roccato that DHLC would need to sign a form releasing the Assignments before Dr. Dennis could take a loan from the Nationwide Policy.

37.     On February 18, 2018, Dr. Dennis made a claim for benefits under the Plan by sending a letter to the Joseph Chirichella, President and CEO of DHLC (the "Claim").  (A copy of the Claim is attached as Exhibit B).

38.     In the Claim, Dr. Dennis requested that DHLC release the Assignments since it had not made any employer-funded contributions to the Nationwide Policy.

39.     DHLC did not respond to Dr. Dennis's Claim.

40.     DHLC is currently the plaintiff in a state court action against Dr. Dennis and others (the "Mercer County Action").

41.     The Mercer County Action was dismissed on summary judgment.

42.     The trial court's decisions granting defendants' motions for summary judgment in the Mercer County Action are currently on appeal with Superior Court of New Jersey, Appellate Division.

43.      On March 26, 2018, Anthony Argiropoulos, counsel for DHLC, sent an email to Michael Stein, an attorney at Pashman Stein Walden Hayden, which states: "Dr. Dennis has reached out to Deborah directly.  Since the [Mercer County Action] is still pending, my client prefers that communications go through the lawyers."

44.     On April 13, 2018, Dr. Dennis's counsel sent a letter to DHLC's counsel concerning his request for benefits under the Plan.

45.    Neither DHLC nor its counsel responded to that letter.

46.    On May 1, 2018, Dr. Dennis's counsel sent an email to DHLC's counsel following up on the Claim and the April 13, 2018 letter.

47.    Neither DHLC nor its counsel responded to that letter.

48.    As a result, Dr. Dennis filed a lawsuit in the Superior Court of New Jersey, Chancery Division – Burlington County against DHLC seeking a declaratory judgment that the Assignments were void for lack of consideration (the "State Court Action").

49.    At the time he filed that action, Dr. Dennis was not aware of the existence of the Plan Document.

50.    Dr. Dennis requested copies of any documents relating to the Plan from DHLC during discovery in the State Court Action.

51.    DHLC did not produce a copy of the Plan Document signed by Dr. Dennis during discovery in the State Court Action.

52.    On or about April 1, 2019, Dr. Dennis discovered a copy of the Plan Document signed by Dr. Dennis while searching for other documents that DHLC had requested in discovery.

53.    After discovering the signed Plan Document, Dr. Dennis offered to enter into a stipulation of dismissal for the State Court Action.

54.    DHLC has not yet responded to Dr. Dennis's offer to voluntarily dismiss the State Court Action.

## COUNT I
## WRONGFUL DENIAL OF BENEFITS
## UNDER § 502(a)(1)(B) OF ERISA

55.    Dr. Dennis repeats the preceding allegations as if set forth at length herein.

56.   Under the Plan, Dr. Dennis has an enforceable right to borrow policy values in excess of DHLC's collaterally assigned interest.

57.   Because DHLC contributed nothing towards the Nationwide Policy premiums, its collaterally assigned interest is zero.

58.   Dr. Dennis made a request for benefits under the Plan with the plan administrator and named fiduciary, DHLC.

59.   DHLC failed to respond to Dr. Dennis's request for benefits.

60.   Under the Plan, DHLC was required to notify him in writing within 90 days of "(i) the specific reason or reasons for the denial; (ii) specific references to the pertinent plan provisions upon which the denial is based; (iii) a description of any additional material or information necessary (iv) an explanation of the plan's claim review procedure describing the steps to be taken by a claimant who wishes to submit his claim for review." (Ex. A, ¶ 10c).

61.   DHLC failed to provide such a notice to Dr. Dennis.

62.   Accordingly, DHLC deprived Dr. Dennis of his right to a full and fair review.

63.   To date, DHLC has refused to provide the benefits that Dr. Dennis has requested under the Plan.

64.   DHLC's improper denial of Dr. Dennis's request for benefits was influenced by a conflict of interest created by the parties' adversarial relationship in the Mercer County Action.

65.    DHLC has indicated that it refused to grant Dr. Dennis's request for benefits under the Plan because it will seek to recover from his Nationwide Policy in the unlikely event that it receives a judgment in the Mercer County Action.

66.   Thus, DHLC's denial of Dr. Dennis's claim was influenced by an improper conflict of interest.

67.     DHLC's denial of Dr. Dennis's request for benefits was also arbitrary and capricious.

68.     DHLC has breached the terms of the Plan and violated the requirements of Section 502(a)(1)(b) of ERISA.

<u>COUNT II</u>
**BREACH OF FIDUCIARY DUTY**
**UNDER § 1104 OF ERISA**

69.     Dr. Dennis repeats the preceding allegations as if set forth at length herein

70.     ERISA provides that a "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . ."  29 U.S.C. § 1104.

71.     DHLC exercised discretionary authority and discretionary control respecting management of the Plan.

72.     DHLC has discretionary authority and discretionary responsibility in the administration of the Plan

73.     In the Plan Document, DHLC is identified as a "named fiduciary."

74.     Accordingly, DHLC is a fiduciary within the meaning of ERISA.

75.     DHLC has refused to release the Assignments due to the fact that it is engaged in litigation with Dr. Dennis.

76.     DHLC has agreed to release similar assignments for at least one other participant in the Plan.

77.     Upon information and belief, DHLC has used Dr. Dennis's right to benefits under the Plan as a bargaining chip in settlement negotiations in the Mercer County Action.

78.     Thus, DHLC has sought to use the Plan, and assets of the Plan, for its own benefit.

79.    DHLC's attempt to use the Plan and the assets of the Plan for its own benefit constitutes a breach of its fiduciary obligations.

**WHEREFORE**, Plaintiff demands that this Court enter judgment against Defendants as follows:

a.  Declaring that DHLC does not have a collaterally assigned interest in the Nationwide Policy because it never made any employer funded contributions to the premiums for that policy;

b.  Declaring that Plaintiff is entitled to borrow policy values from the Nationwide Policy under the Plan;

c.  Ordering DHLC to release the Assignments;

d.  Awarding Plaintiff damages for DHLC's breach of its fiduciary duty;

e.  Awarding Plaintiff the costs of suit, including reasonable attorneys' fees;

f.  Granting such other relief as this Court may deem just and equitable.

**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
Attorneys for Plaintiff Charles Dennis, M.D.


By:    /s/ James W. Boyan III
        JAMES W. BOYAN III

Dated: April 16, 2019.

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

The undersigned hereby certifies that the matter in controversy is not the subject of any other action in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated, except, as stated in the within Complaint, that Plaintiff filed a civil action against Defendants Deborah Heart and Lung Center in the Superior Court of New Jersey, Burlington County seeking a declaration that the Assignments are not enforceable that is still pending (the "State Court Action").  The State Court Action does not include any claims under the Employee Retirement Income Security Act of 1974.  As stated in the Complaint, Plaintiff has offered to voluntarily dismiss the State Court Action.

**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
Attorneys for Plaintiff Charles Dennis, M.D.


By:      /s/ James W. Boyan III
         JAMES W. BOYAN III

Dated: April 16, 2019.

# EXHIBIT A

## SPLIT-DOLLAR AGREEMENT

THIS AGREEMENT, made as of the 2nd day of February, 1994, by and between DEBORAH HEART
& LUNG CENTER, a New Jersey corporation (hereinafter referred to as the "Employer"), and
CHARLES A. DENNIS of Moorestown, New Jersey (hereinafter referred to as the "Employee").

WITNESSETH THAT:

WHEREAS, the Employee is employed by the Employer; and

WHEREAS, the Employer is desirous of retaining the services of the Employee and of assisting the
Employee in paying for life insurance on his own life; and

WHEREAS, the Employer has determined that this assistance can be provided under a split dollar life
insurance arrangement; and

WHEREAS, the Employee has applied for, and is the owner of the insurance policy or policies listed in
Schedule A attached hereto, hereinafter referred to as the "Policy"; and

WHEREAS, the Employer and the Employee agree to make the Policy subject to this Agreement; and

WHEREAS, the Employee has assigned the Policy to the Employer as collateral for amounts to be
advanced by the Employer under this Agreement by an instrument of assignment filed with the Insurer
(hereinafter referred to as the "Assignment");

NOW, THEREFORE, in consideration of the promises and of the mutual convenants herein contained,
the Parties hereto hereby agree as follows:

1.  The Parties hereto agree that the Policy shall be subject to the terms and conditions of this Agreement and of the Assignment filed with the Insurer relating to the Policy. The Employee shall be the sole and absolute owner of the Policy and may exercise all ownership rights granted to the owner thereof by the terms of the Policy, except as may be otherwise provided herein and in the Assignment.

2.  The premium for the Policy will be paid by the Employer during the Employee's employment by the Employer and for any period of time that it may have an obligation to such premiums thereafter. The premium will be allocated between the Employee and the Employer. The Employee's share of the premium (term insurance allocation) shall be paid by the Employer as agent for the Employee and shall be charged to the Employee as cash compensation, and for all purposes, including the Assignment, shall be deemed cash compensation and not Employer paid premium.

3.  The Assignment shall not be terminated, altered or amended by the Employee without the express written consent of the Employer. The Parties hereto agree to take reasonable action to cause such Assignment to conform to the provisions of this Agreement.

4.  a. Except as otherwise provided herein, the Employee shall not sell, assign, transfer, surrender or cancel the Policy, without, in any such case, the express written consent of the Employer.

    b. The Employee shall have the right to change the beneficiary or beneficiaries and to borrow policy values only with regard to cash value and death benefit in excess of the collaterally assigned interest of the Employer as described under Sections 5 and 7.

    c. The Employer shall not borrow against the Policy without the express written consent of the Employee.

d. Upon the termination of this Agreement, the Employee shall have the right to take any action with regard to the cash value of the policy in excess of the collaterally assigned interest of the Employer.

5.     a. Upon the death of the Employee, the Employer shall promptly take all action necessary to obtain its share of the death benefit provided under the Policy.

    b. The Employer shall have the unqualified right to receive a portion of such death benefit equal to the total amount of its share of premiums paid by it hereunder, (hereinafter referred to as the "Net Premiums") without interest. The balance of the death benefit provided under the Policy, if any, shall be paid directly by the Insurer to the beneficiary or beneficiaries and in the manner designated by the Employee. No amount shall be paid from such death benefit to the beneficiary or beneficiaries designated by the Employee until the Employer or Insurer acknowledges in writing that the full amount due to the Employer hereunder has been paid. The Parties hereto agree that the beneficiary designation provision of the Policy shall conform to the provisions hereof.

6. The Employer shall not merge or consolidate into or with another organization, or reorganize, or sell substantially all of its assets to another organization, firm or person unless and until such succeeding or continuing organization, firm or person agrees to assume and discharge the obligations of the Employer under this Agreement. Upon the occurrence of such event, the term "Employer" as used in this Agreement shall be deemed to refer to such successor or survivor organization.

7.     a. This Agreement shall terminate upon the occurrence of the earliest of the following events: (i) the Employee's death and the payment of proceeds pursuant to Section 5 of this Agreement, or (ii) the Policy anniversary next following the Employee's termination of employment.

b. Upon such termination under Section 7.a.(ii) of this Agreement, the Policy shall be partially surrendered in an amount necessary to repay the Employer the total amount of its share of the premiums paid by it hereunder, (Net Premiums) without interest. In the event the cash surrender value of the Policy is insufficient to fully repay the Employer, the entire cash surrender value shall be used to repay the Employer without recourse to the Employee for the balance of the premium payments. Upon repayment of the premiums to the Employer, the Employer shall release its interest in the Policy, and the Employee will thereafter own the Policy free from this Agreement and the Assignment. The Employee agrees to execute any and all documents necessary to effect repayment of the premiums to the Employer as provided herein.

8. The Parties hereto agree that this Agreement shall take precedence over any provisions of the Assignment. The Employer agrees not to exercise any right possessed by it under the Assignment except in conformity with this Agreement.

9. This Agreement may not be amended, altered or modified except by a written instrument signed by both of the Parties hereto and may not be otherwise terminated except as provided herein.

10. a. The split-dollar arrangement contemplated herein is an exempt welfare plan under regulations promulgated under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA").

b. For purposes of ERISA, the Employer will be the "named fiduciary" and "plan administrator" of the split-dollar arrangement contemplated herein, and this Agreement is hereby designated as the written plan instrument.

c. The Employee or any beneficiary of his may file a request for benefits with the plan administrator. If a claim request is wholly or partially denied, the plan administrator will furnish

**P000340**

to the claimant a notice of its decision within ninety (90) days in writing, and in a manner to be understood by the claimant, which notice will contain the following information:

    (i)    the specific reason or reasons for the denial;

    (ii)    specific references to pertinent plan provisions upon which the denial is based;

    (iii)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation as to why such material or information is necessary.

    (iv)    an explanation of the plan's claim-review procedure describing the steps to be taken by a claimant who wishes to submit his claim for review.

d.    A claimant or his authorized representative may, with respect to any denied claim,

    (i)    request a review upon written application filed within sixty (60) days after receipt by the claimant of written notice of the denial of his claim;

    (ii)    review pertinent documents; and

    (iii)    submit issues and comments in writing.

Any request or submission will be in writing and will be directed to the plan administrator. The plan administrator will have the sole responsibility for the review of any denied claim and will take all appropriate steps in light of its findings. The plan administrator will render a decision upon review of a denied claim within sixty (60) days after receipt of a request for review. If special circumstances warrant additional time, the decision will be rendered as soon as possible, but not later than one hundred twenty

P000341

(120) days after receipt of request for review.  Written notice of any such extension will be furnished to the claimant prior to the commencement of the extension.  The decision on review will be in writing and will include specific reasons for the decision written in a manner to be understood by the claimant, as well as the specific references of the pertinent provisions of the plan on which the decision is based.  If the decision on review is not furnished to the claimant within the time limits described above, the claim will be deemed denied on review.

11.     This Agreement shall be binding upon and inure to the benefit of the Employer and its successors and assignees and the Employee and his successors, assignees, heirs, executors, administrators and beneficiaries.

12.     Except as may be preempted by ERISA, this Agreement, and the rights of the Parties hereunder, shall be governed by and construed in accordance with the laws of the State of New Jersey.

IN WITNESS WHEREOF, the Employer has caused this Agreement to be executed by its officer thereunto duly authorized and the Employee has hereunto set his hand and seal, all as of the day and year first above written.

By X _____

Title: EXECUTIVE DIRECTOR

X _____
Charles A. Dennis

DENNIS4

**P000342**

# EXHIBIT B

*Charles Dennis, M.D.*
*764 Bowman Lane*
*Moorestown, New Jersey  08057*

February 18, 2018

Joseph Chirichella
President and CEO
Deborah Heart and Lung Center
Deborah Hospital Foundation
200 Trenton Road
Browns Mills, New Jersey 08015

Dear Joe,

I am writing to ask for your assistance in releasing an assignment on a deferred income account that originated at Deborah.

In case you do not recall, Deborah offered a deferred income benefit in 1994.  The vehicle was a split-dollar insurance product marketed by a firm called MKA using a Nationwide product.  Split-dollar accounts have significant flexibility in structure.  The structure ranges from the organization completely funding the insurance and deferred income to shared organization-employee funding to employee funding using deferred income.  Deborah's product was the employee-funded version, whereby a portion of my compensation was diverted to this account.

At the time of the account's creation, I was told that all of these products require an assignment of benefits by the employee to the organization.  That assignment allows the organization to capture their contribution to the account assuming that the agreement specifies the parameters. The contribution is usually the insurance premium or loans made to the employee for the insurance premium.  In my case, both the insurance and the retirement funding were paid from my own deferred income, so there should be no claim for costs by Deborah.  The account was portable, and I continued to pay the insurance policy costs after my separation from Deborah in July 2006.

As I prepare for retirement, this account that I funded will be part of my portfolio, and it has been brought to my attention that I require Deborah to execute a release of its assignment. I enclose the original assignment from July 21, 1994 and the forms that need to be completed to release this assignment.  I am sending the forms to you because the release requires a board resolution.  I also enclose a self-addressed stamped envelope for the return.

While I realize that Deborah and I have had a contentious relationship over the past decade, I hope that you can recognize that this matter is completely unrelated to the dispute.  I would therefore appreciate an expeditious release.  If there are questions, please contact me at 856-979-8740 or at cdennis51@comcast.net.

With best regards,

Charles Dennis, MD

P000122